**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JAMES CRITELLI, et al.,**

**Plaintiffs,**

**v.**

**DANAHER CORPORATION, et al.,**

**Defendants.**

**Case No.: 6:25-cv-01780-AGM-LHP**

# ORDER

Danaher Corporation, an American Fortune 200 conglomerate and federal government contractor, has a Diversity, Equity, and Inclusion policy (the "**DEI Policy**") that since at least 2021 has flagrantly and in writing mandated discrimination, exclusion, and inequity in the workplace.[1] That is the essence of the allegations made in this case by six white male current and former employees of Danaher[2] who filed this case on behalf of themselves and those similarly situated.

Allegedly, Danaher and nearly two dozen of its wholly-owned subsidiaries explicitly require that employment decisions be made with preference for "underrepresented candidates"—a term Danaher defines as women and "people of color." The Plaintiffs aren't entirely certain what Danaher means by "people of color,"[3] but whoever gets the benefit of

[1] For the purposes of a motion to dismiss, the facts alleged in the Amended Complaint are taken as true. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

[2] Because the DEI Policy refers to "Danaher and its directly and indirectly controlled subsidiaries worldwide as 'Danaher,'" this Order does the same.

[3] The Amended Complaint alleges that the DEI Policy "classifies people who are not white as 'People of Color' ('POC')" (doc. # 20, p. 10) yet some races may be treated more

that designation, it isn't white men. White men are effectively second-class candidates, even if they are more qualified. Apparently without reference to who applies, Danaher wants half of every slate of interviewees for an open position to be composed of 50% "underrepresented" candidates. A fleet of Danaher employees—the "Talent Acquisition Department" ("**Talent Acquisition**")—is employed to engineer that outcome. Among other things, Talent Acquisition loosens job requirements for "underrepresented" candidates, short-lists "underrepresented" candidates for an interview, and tethers hiring managers' performance evaluations and compensation to their ability to meet the objectives of the DEI Policy.

The Plaintiffs, who are not now and can never be women or "people of color," allege that the DEI Policy intentionally excludes them from promotions based on immutable characteristics protected under numerous state and federal anti-discrimination statutes. And they allege that Danaher is hardly doing any of this in secret; in fact, Danaher is proud as punch of its campaign to discriminate. Danaher publicized a "Sustainability Report," which crowed that "68% of 2023 new hires were women and/or People of Color (POC)" and, by the end of 2023, "POCs represented 42% of [Danaher's] U.S. workforce."

The Plaintiffs acknowledge that "there is nothing unlawful about striving to ensure an organization offers equal employment opportunities to everyone," but they allege that Danaher does the opposite; it proudly and explicitly ensures that everyone *does not* have equal opportunities by requiring that "race and gender must be considered when evaluating internal candidates for promotion or transfer within Danaher and its OpCos." (*Id.* ¶¶ 60–61.) From

---

preferentially within the "POC" designation (*id.* ¶ 58 n.5). "Regardless, white men . . . are not covered." (*Id.*)

the Plaintiffs' standpoint, "[d]iscrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim" and "[r]acial discrimination against whites is just as repugnant to constitutionally protected values of equality as racial discrimination against blacks." *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1103 (11th Cir. 2001). They contend that the DEI Policy, Danaher's approach to implementing that policy, and the statistics Danaher trumpets are all simply reflective of Danaher's commitment to violating Title VII by discriminating against white men. The Plaintiffs allege, on behalf of themselves and others similarly situated, that Danaher's DEI Policy denies them an equal playing field to compete for open positions in the company.

After the Plaintiffs filed their Amended Complaint (Doc. # 20; the "**Amended Complaint**"), Defendants Danaher Corporation ("**Danaher**"), Pall Corporation ("**Pall**"), Beckman Coulter, Inc. ("**Beckman Coulter**"), Global Life Sciences Solutions USA LLC d/b/a Cytiva ("**Cytiva**"), and Radiometer America, Inc. ("**Radiometer**") moved to dismiss (Doc. # 24; the "**Motion**") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Plaintiffs timely responded (Doc. # 49) and the Defendants replied (Doc. # 55). For the reasons that follow, the Motion is due to be denied except as indicated below.

## I. BACKGROUND

Danaher provides goods and services to the United States government and others in the life sciences, diagnostics, and biotechnology sectors. Since at least 2021, Danaher has operated under a DEI Policy that "sets out the principles upon which Danaher's D+I program is based" and creates "requirements" that apply to Danaher's employees and businesses. (Doc. # 20 ¶¶ 52–54.) The DEI Policy "applies to (among other topics) [Danaher's] practices and

policies on talent acquisition and selection; compensation and benefits; development and training, career growth, associate engagement and inclusion; and transitions." (*Id.* ¶ 52.) The Amended Complaint alleges that, consistent with the DEI Policy, Danaher engaged in what Danaher referred to as "intentional diversity recruitment efforts" with "discreet [sic] and specific actions to broaden candidate pools," and established functional quotas for promotions. (*Id.* ¶ 62.)

**A. The Amended Complaint**

Danaher's OpCos include Pall, Cytiva, Beckman Coulter, and Radiometer. As the parent company, Danaher asserts control over the OpCos, including its recruiting and hiring practices. (*Id.* ¶ 34.) Collectively, Danaher and its OpCos employ over 25,000 people in the United States. (*Id.* ¶ 10.)

Danaher imposes its DEI Policy on all its OpCos by dictating that the policy "applies to Danaher Corporation and all of its directly and indirectly controlled subsidiaries worldwide, and each of their respective associates." (*Id.* ¶ 54.) The policy was explicitly "approved by Danaher Corporation's President and Chief Executive Officer and Senior Vice President-Human Resources." (*Id.*) In its own words, the DEI Policy "set[] out the principles upon which Danaher's [DEI] program is based and the requirements applicable to [its] employees [] and businesses." (*Id.* ¶ 52.) Among other things, those principles include "specific" and "intentional" manipulation of the composition of slates of interviewees to achieve Danaher's goal of "50% underrepresented candidates interviewed." (*Id.* ¶ 62.)

Danaher's internal interview and hiring process is standardized. When new positions become available for any Danaher-affiliated company, the openings are posted on an internal,

centralized Danaher website. (*Id.* ¶ 55.) Any employee at Danaher or one of its subsidiaries can apply for an open position at any company, but the selection process is always subject to the DEI Policy. (*Id.* ¶ 52.)

Talent Acquisition controls the hiring and interview process and is responsible for implementing the DEI Policy. (*Id.* ¶ 67.) When employees apply internally for open positions, Talent Acquisition screens applicants to create a slate of candidates for the hiring manager to interview. (*Id.* ¶ 69.) In other words, Talent Acquisition determines who progresses from the "applicant" to "candidate" stage in the hiring process. (*Id.*) Naturally, an "applicant" who does not become a "candidate" will not get the job. (*Id.* ¶ 70) ("Applicants that did not progress to the candidate stage [and] did not have an opportunity to interview with the hiring manager were effectively 'rejected' for the position. Only candidates selected for interview remained in contention for the position.")

The Plaintiffs allege that the number of interview slots is limited, so in that sense the slate of interviewees presents a zero-sum game. Yet "diverse" applicants are placed on a shortlist—"an advantage specifically reserved for diverse candidates"—to be interviewed by the hiring manager and set apart from any "non-diverse" candidates. (*Id.* ¶ 73.) There is no shortlist for non-diverse applicants. (*Id.*) No matter the race and sex composition of the applicant pool, Danaher bends over backwards to get a slate of interviewees that is 50% "underrepresented." Because the number of applicants selected for interviews is fixed, (*id.* ¶ 77), "diverse" candidates are disproportionately represented in interview slates relative to the overall applicant pool, to the exclusion of qualified, white males. (*Id.* ¶ 75.)

Danaher's process effectively "limit[s] the hiring manager's ability to make merit-based selections, resulting in outcomes engineered to satisfy Danaher's hiring quotas." (*Id.* ¶ 78.) Additionally, hiring managers face mounting pressure to increase "minority representation" through the hiring process, treating diverse candidates more favorably for positions, and reinforcing a "quota-driven approach to hiring and promotion." (*Id.* ¶¶ 80, 86.) To that end, Danaher tethers performance evaluations and compensation to a hiring manager's ability to meet the DEI Policy objectives. (*Id.* ¶ 82.)

For example, part of the management training at Pall includes a presentation that requires managers to "pick 2-3 actions" from a list of five "options" that include "[f]or all talent acquisition searches throughout 2023, drive 100% diverse slates and diverse interview teams," "[a]chieve a 5pt improvement on the Diversity/Inclusion dimension in the annual engagement survey," "[a]chieve annual voluntary turnover of underrepresented talent <5%," and "[i]ncrease diversity representation in my Succession plan by 20%." (*Id.* ¶ 84.) By 2023, over two-thirds (68%) of Danaher's new hires in the United States were women or minorities. (*Id.* ¶ 88.) More recently, in an email from Pall's Vice President, Danaher communicated its "requirement that 50% of interviewed candidates be diverse" and reinforced "Pall's objective to hire 34.4% of women and 37.2% POC (people of color)." (*Id.* ¶ 87.)

Ultimately, "[h]ires that moved Danaher closer to its functional quotas were considered wins; hiring decisions that were not aligned with Danaher's objectives were considered losses." (*Id.* ¶ 79.) Even though white men make up far more than a third of the qualified applicant pool, "Danaher celebrated success because less than 1/3 of the people it hired in the United States in 2023 were white men." (*Id.* ¶¶ 89–91.)

The Plaintiffs assert they are the victims of systemic discrimination based on their sex and race because of the Defendants' application of Danaher's DEI Policy. Generally, the Plaintiffs allege that they would apply for internally-posted positions for which they were qualified, but they were rejected in favor of a woman or a minority. The Plaintiffs assert that the deprivation of a chance to interview is a denial of the opportunity to get the job because "[w]ithout the opportunity to interview, the excluded applicant has no chance of getting the job. Similarly, they are deprived of the networking opportunity and experience of interviewing for more advanced or different positions." (*Id.* ¶ 94.)

In the instant action, the Plaintiffs assert sex and race discrimination claims in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and several state civil rights laws.

**1. Mr. Critelli**

Mr. Critelli was employed by Pall, a Danaher OpCo, in various roles from 2012 to April 18, 2025. His roles included Director of Facilities, Engineering Operations Manager, Focus Factory Manager, and Process Engineering Manager. Between 2021 and 2024, Mr. Critelli applied for multiple positions at Danaher and its OpCos. Mr. Critelli was qualified for every position for which he applied and those positions would have been advancements or promotions. However, he was denied the opportunity to even interview for nearly every position for which he applied. Because of the DEI Policy, Mr. Critelli asserts that less qualified, "diverse" candidates received interview opportunities for those positions, and that he was denied the opportunity to interview because of his race and sex.

**2. Mr. Theodore**

Mr. Theodore was employed by Pall in various engineering positions from April 2023 to January 2024. Between 2022 and 2024, Mr. Theodore applied for several positions with various OpCos and Danaher itself. He alleges that he was qualified for the positions, those positions would have been advancements or promotions, he was denied an interview because he is a white male, and less qualified candidates who were "diverse" were given an interview.

**3. Mr. Eggerichs**

Mr. Eggerichs has been employed by Pall since July 2022. He was employed in various engineering positions. Between 2022 and 2024, Mr. Eggerichs applied for several positions for which he was qualified. However, less qualified, diverse candidates were awarded promotional opportunities that Mr. Eggerichs asserts he was denied because of his race and sex.

**4. Mr. Cunningham**

Mr. Cunningham has been employed by Cytiva, a Danaher OpCo, since April 2019 as an account manager. Before that, he held a similar role at the company that was Cytiva's predecessor. All told, he has approximately 10 years of experience as an account manager. In September 2023, Mr. Cunningham applied for a manager position on the West Coast of the United States, a position for which he alleges he "satisfied every substantive requirement." Mr. Cunningham was denied an opportunity to interview for the position, ostensibly because he resided on the East Coast and "did not fulfill the position's residency requirement." However, the same residency requirement was waived for a less-qualified female employee. While Mr. Cunningham was not even selected to interview because he resided on the East

Coast, the less-qualified female candidate got the job even though she, like Mr. Cunningham, lived on the East Coast. Mr. Cunningham asserts that he was denied an opportunity to interview for the position because of his race and sex.

In April 2025, the same position became available a second time. On this occasion, Mr. Cunningham alleges that he received a "perfunctory" interview, during which he sensed "obvious disinterest in his candidacy." The position was, once again, awarded to a less-qualified female applicant.

**5. Mr. Volek**

Mr. Volek has been employed by Beckman Coulter since 2017 as a Senior Sales Representative with over 24 years of experience in the industry. Mr. Volek applied and interviewed for the positions of Regional Sales Manager and Distribution Manager. Mr. Volek was denied the position and asserts that it was because of his race and sex.

**6. Mr. Kumnick**

Mr. Kumnick has been employed by Radiometer, a Danaher OpCo, since 2022 as a Health Systems Manager. In 2023, Mr. Kumnick's supervisor encouraged him to apply for a promotion because the supervisor wanted to help him get promoted. Despite Mr. Kumnick's performance and his supervisor's support, Mr. Kumnick was not promoted or considered for the promotion. Within that same time, he alleges that 80% or more of the salespeople who were promoted were women. Later, Mr. Kumnick was up for a mid-year promotion but the head of sales informed him he would not be considered. Less qualified diverse "persons of color" and women got a chance to interview and many of those applicants were selected over

Mr. Kumnick. Mr. Kumnick asserts he was denied promotional opportunities and excluded from advancement based on his race and sex.

**7. Class Members**

The Plaintiffs seek certification of a class action pursuant to Title VII and section 1981, as well as certification of various subclasses under section 1981 and other individual state-law discrimination claims.

Messrs. Critelli, Cunningham, and Volek define a proposed "Title VII Class" as:

> All white men that were employed by Danaher or an OpCo, who during the applicable statute of limitations 1) applied for an internally posted position at Danaher or an OpCo, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such posted position was awarded to a woman or person of color.

(*See* Doc. # 20 ¶ 142.)

Messrs. Critelli, Theodore and Eggerichs define a proposed "42 U.S.C. 1981 Class" as:

> All white men that were employed by Danaher or an OpCo, who during the applicable statute of limitations 1) applied for an internally posted position at Danaher or an OpCo, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such posted position was awarded to a person of color.

(*See* Doc. # 20 ¶ 143.)

Messrs. Critelli, Theodore and Eggerichs define a proposed "42 U.S.C. 1981 Pall Subclass" as:

> All white men that were employed by Pall, Danaher or an Opco who during the applicable statute of limitations 1) applied for an internally posted position at Pall, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such position was awarded to a person of color.

(*See* Doc. # 20 ¶ 144.)

Mr. Critelli defines a proposed "FCRA Pall Class" as:

> All white men that were employed by Pall, Danaher or an Opco who during the applicable statute of limitations 1) applied for an internally posted position at Pall in Florida, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such posted position was awarded to a qualified woman or person of color.

(*See* Doc. # 20 ¶ 145.)

Mr. Cunningham defines a proposed "MFEPA Cytiva Class" as:

> All white men that were employed by Cytiva, Danaher or an OpCp during the applicable statute of limitations 1) applied for an internally posted position at Cytiva in Massachusetts, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such posted position was awarded to a woman or person of color.

(*See* Doc. # 20 ¶ 146.)

Mr. Volek defines a proposed "NYSHRL Beckman Coulter Class" as:

> All white men that were employed by Beckman Coulter, Danaher or an OpCo who during the applicable statute of limitations 1) applied for an internally posted position at Beckman Coulter in New York, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such posted position was awarded to a woman or person of color.

(*See* Doc. # 20 ¶ 147.)

Mr. Kumnick defines a proposed "FEHA Radiometer Class" as:

> All white men that were employed by Radiometer, Danaher or an OpCo who during the applicable statute of limitations 1) applied for an internally posted position at Radiometer in California, 2) satisfied the posted job requirements, 3) were not selected for the position, and 4) such posted position was awarded to a woman or person of color.

(*See* Doc. # 20 ¶ 148.) The Plaintiffs seek to represent the similarly situated members of the class to address the "systemic issues of discriminatory hiring and promotional policies that have harmed all Class members and all those who will become Class Members." (*Id.* ¶ 149.)

### B. The Motion

The Defendants move to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that: (1) some of the named Plaintiffs failed to exhaust their administrative remedies; (2) some claims are time barred; (3) the Plaintiffs failed to allege plausible claims of discrimination; (4) the class allegations fail to satisfy Federal Rule of Civil Procedure 23; and (5) Defendant Danaher is improperly named.

## II. LEGAL STANDARD

On a motion to dismiss, the court limits its consideration to the four corners of the complaint and any exhibits attached to it. *Thaeter v. Palm Beach Cnty. Sheriff's Off.*, 449 F.3d 1342, 1352 (11th Cir. 2006) (citation modified). The court must accept factual allegations as true and draw reasonable inferences in the plaintiff's favor. *Pielage*, 516 F.3d at 1284. While "detailed factual allegations" are unnecessary, the allegations must consist of more than "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks and citations omitted). To survive a motion to dismiss, the complaint must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). All in all, "the factual allegations must be enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (citation modified) (quoting *Twombly*, 550 U.S. at 555).

## III. ANALYSIS

The Defendants raise five arguments in favor of dismissal, each of which are addressed here.

### A. Equitable Considerations Weigh Against Dismissal for Failure to Exhaust Administrative Remedies

First, the Defendants argue that the claims raised by Messrs. Cunningham, Volek, and Kumnick must be dismissed because these plaintiffs have not exhausted their administrative remedies before commencing suit. Specifically, the Amended Complaint does not allege that Messrs. Cunningham, Volek, and Kumnick filed Charges of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**") and received the required right-to-sue notices before filing their Title VII claims.

Messrs. Cunningham, Volek, and Kumnick respond that they are entitled to piggy-back on Mr. Critelli's allegations that he exhausted his administrative remedies. They also allege that receipt of their right-to-sue notices was imminent at the time the Amended Complaint was filed.[4]

As discussed below, there is reason to question whether Messrs. Cunningham, Volek, and Kumnick are entitled to piggy-back on Mr. Critelli's allegations. Yet that issue is not dispositive because in any event equitable considerations weigh against dismissal for failure to exhaust administrative remedies.

As a condition precedent to filing a Title VII action in federal court, "a private plaintiff must file an EEOC complaint against the discriminating party and receive statutory notice from the EEOC of his or her right to sue the respondent named in the charge." *Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562, 1567 (11th Cir. 1996). When a plaintiff fails to

[4] Because leave is granted to amend on other grounds, if a Second Amended Complaint is filed, Messrs. Cunningham, Volek, and Kumnick should address the status of their right-to-sue notices.

allege exhaustion of conditions precedent or attach either a filed EEOC charge or a right-to-sue letter, dismissal is warranted. *See Burnett v. Jacksonville Sheriff's Off.*, 376 F. App'x 905, 906–07 (11th Cir. 2010). However, a plaintiff who has not filed an EEOC charge may rely on another plaintiff's charge, provided that "(1) the charge being relied upon [is] timely and not otherwise defective; and (2) the individual claims of the filing and non-filing plaintiffs [arose] out of similar discriminatory treatment in the same time frame." *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir. 1993). This "single-filing" or "piggybacking" rule provides a safety net for aggrieved employees who failed to file their own EEOC charge by allowing them to pursue a claim under another named plaintiff's timely-filed charge. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1101 (11th Cir. 1996).

In the Eleventh Circuit, there are specific circumstances in which a plaintiff may invoke the "single-filing rule." First, in the context of a class action suit, unnamed plaintiffs may rely on the EEOC charge filed by the named plaintiff. *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498–99 (5th Cir. 1968).[5] Second, intervenors who have not filed EEOC charges may rely on the charge of one of the original plaintiffs. *Wheeler v. Am. Home Prods. Corp.*, 582 F.2d 891, 897–98 (5th Cir. 1977). Third, plaintiffs in multiple-plaintiff, non-class action lawsuits may rely on the charge filed by one of their co-plaintiffs. *Crawford v. U.S. Steel Corp.*, 660 F.2d 663, 665–66 (5th Cir. Unit B 1981). Fourth, plaintiffs who unsuccessfully attempt to intervene in

---

[5] The decisions of the Fifth Circuit, "as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

another plaintiff's lawsuit may nevertheless invoke the single-filing rule in their own case. *Calloway*, 986 F.2d at 450.

In their Response, the Plaintiffs invoke the single-filing rule, arguing that Messrs. Cunningham, Volek, and Kumnick need not have received their own right-to-sue letters because Mr. Critelli satisfied the condition precedent. The Defendants argue that single-filing rule cannot apply here, as Messrs. Cunningham, Volek, and Kumnick filed their own individual EEOC charges and thus are precluded from piggybacking while their charges remain pending.

It is true that in *Gitlitz v. Compagnie Nationale Air France*, the Eleventh Circuit declined to extend the single-filing rule to a plaintiff who filed an individual EEOC charge. 129 F.3d 554, 557 (11th Cir. 1997). But even if this Court assumed that the single-filing rule could not apply here, that would not end the analysis. A right-to-sue notice is a condition precedent subject to equitable modification, not a jurisdictional prerequisite to suit. *Pinkard v. Pullman–Standard*, 678 F.2d 1211, 1216 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983). A Title VII claim that fails to satisfy the condition precedent need not be dismissed where reasons exist to equitably modify the condition. *See Fouche v. Jekyll Island State Park Auth.*, 713 F.2d 1518, 1525–26 (11th Cir. 1983).

Here, several equitable considerations weigh against dismissal of Messrs. Cunningham, Volek, and Kumnick's claims: (1) Mr. Critelli's EEOC charge gives the Defendants fair notice of the nature of the claims; (2) the Defendants have not sufficiently argued that it is unfairly prejudicial to allow Messrs. Cunningham, Volek, and Kumnick's claims, in addition to the claims by other named plaintiffs; (3) the Plaintiffs argue that the Defendants rejected their proposal to agree to a stay pending administrative exhaustion to avoid unnecessary motion

practice and conserve the Court's resources; and (4) Messrs. Cunningham, Volek, and Kumnick filed with the EEOC and requested their right-to-sue letters, and dismissal would simply prompt refiling once the notices issue. (Doc. # 20 ¶¶ 47–49.) Given this, the Motion is due to be denied to the extent that it seeks to dismiss Messrs. Cunningham, Volek, and Kumnick for failure to exhaust administrative remedies.

### B. In a Putative Class Action Alleging Pattern and Practice Discrimination, it is Premature to Decide Whether the Continuing Violation Doctrine Applies

Second, the Defendants argue that certain aspects of the asserted claims are time-barred. As a condition precedent to suit, a plaintiff must first exhaust his administrative remedies under Title VII by timely filing a charge of discrimination with the EEOC. *H & R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010). In Florida, a charge "must be filed within 300 days of the last discriminatory act." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002) (citing 42 U.S.C. § 2000e–5(e)(1)). Similarly, a plaintiff suing under the Florida Civil Rights Act ("**FCRA**") must file a charge with the EEOC no more than 365 days after the last discriminatory act. *See* Fla. Stat. § 760.11(1).

Here, Messrs. Critelli, Cunningham, and Kumnick filed their EEOC charges on January 22, October 23, and November 3, 2025, respectively. (Doc. # 20, ¶¶ 44, 47, 49.) The Defendants assert that the following claims are time barred and must be dismissed: Mr. Critelli's Title VII claims to the extent that they concern conduct dating before March 28, 2024 (i.e., 300 days before January 22, 2025); Mr. Critelli's FCRA claims to the extent that they concern conduct dating before January 23, 2024 (i.e., 365 days before January 22, 2025); Mr.

Cunningham's Title VII and MFEPA[6] claims to the extent that they concern conduct dating before December 27, 2024 (i.e., 300 days before October 23, 2025); and Mr. Kumnick's Title VII claims to the extent that they concern conduct dating before January 7, 2025 (i.e., 300 days before November 3, 2025). (*See id.*, ¶¶ 99–100 (Critelli's potential claims going back to 2021), 115–18 (Cunningham's 2023 claim), 131–38 (Kumnick's 2023 and 2024 claims)). The Plaintiffs argue that their claims are not time-barred because Danaher's DEI Policy created a single "continuing violation."

Although the Defendants frame the Plaintiffs' allegations as a series of isolated and disconnected events, the Plaintiffs respond that they and others similarly situated to them were each subject to adverse employment actions that flowed from a systemic and standardized policy of discrimination, exclusion, and inequity mandated across Danaher and the OpCos over a period of years. In the Plaintiffs' view, this means that each adverse employment action that they (and others similarly situated to them) experienced is fairly considered part of the same claim. *See Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007).

But while there may be merit to the Plaintiffs' argument that the continuing violation doctrine applies here, the posture of this case makes that determination premature. The Plaintiffs allege a pattern and practice of discrimination where "discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Int'l*

---

[6] The "Massachusetts Fair Employment Practices Act" ("**MFEPA**"). Claims under the MFEPA are analyzed under the same framework as Title VII claims. S*ee Farzinpour v. Berklee Coll. of Music*, 616 F. Supp. 3d 98, 113 (D. Mass. 2022). As with Title VII, plaintiffs alleging a claim under MFEPA must file an administrative charge within 300 days of the alleged discrimination. *Salomon v. Mass. Hous. Fin. Agency*, No. 22-cv-10181-ADB, 2023 WL2588334, at *7 (D. Mass. Mar. 21, 2023).

*Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). A pattern or practice claim is alleged "through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally," and through "direct evidence of an intent to discriminate . . . ." *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000).

"[P]attern or practice claims for such relief must be litigated either as class actions or not at all." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 967 (11th Cir. 2008). Here, where a pattern or practice claim is alleged in the context of a putative class action where class certification has not yet been decided, it is premature to determine whether the continuing violation doctrine applies. For that reason, the Motion must be denied as to whether the individual Plaintiffs' claims are time-barred.

**C. Failure to State a Claim**

Third, the Defendants argue that the Amended Complaint fails to plausibly allege claims of discrimination. In the Defendants' view, the Plaintiffs are merely speculating about why they were not given interviews or promotions. (Doc. # 24 at 8.) The Defendants further contend that goals are not the same thing as quotas, and the DEI Policy is merely an "aspirational effort" for recruiting, "broaden[ing] the range of talent pools," and "maximiz[ing] the chances of hiring the most qualified candidate, irrespective of sex or race;" and that "suggestions to the contrary are simply make-believe." (Doc. # 24 at 3–4.) The Plaintiffs respond that they alleged facts that plausibly suggest discrimination, including specific examples of the DEI Policy's requirements, the Plaintiffs' qualifications, and Danaher's overall decision-making framework, which encouraged discriminatory hiring

through (1) a quota approach and (2) openly and proudly giving priority to females and "persons of color." (Doc. # 49 at 9.)

Under Title VII, it is unlawful for an employer "to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[7] To state a prima facie case based on a failure to promote,[8] a plaintiff must demonstrate that: "(1) he belonged to a protected class; (2) he was qualified for and applied for a position; (3) despite qualifications, he was rejected; and (4) the position was filled with an individual outside the protected class." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1347 n.2 (11th Cir. 2007) (citation

---

[7] Claims under Title VII, § 1981, FCRA, MFEPA, NYSHRL, and FEHA have the same requirements of proof and present the same analytical framework. *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

[8] While some of the Plaintiffs' claims allege discrimination through denial of promotions, some could be construed as discrimination through a failure to interview. The parties have not pointed to controlling authority on whether failure to interview is a cognizable claim under Title VII, but common sense suggests that the answer is either (1) yes or it is (2) no, because discrimination in interview selection is *necessarily* discrimination in hiring. If an interview slate has a set number of spots on it, then allocation of those spots is zero-sum just as "[c]ollege admissions [were] zero-sum" in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 218 (2023). As the Supreme Court acknowledged in that context, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218–19. And even if failure to interview is not a cognizable claim in all contexts, what the Plaintiffs allege here is truly extraordinary, in the sense that they allege that there is a written policy that intentionally, explicitly discriminates by declining to interview otherwise-qualified candidates based on protected characteristics. When (1) there is a written policy that intentionally, explicitly discriminates by making interview decisions based on protected characteristics and (2) an interview is necessary to get the job, then the refusal to interview based on protected characteristics is a refusal to hire based on protected characteristics. Gate-keeping discrimination in that fashion simply discriminates against more people, more efficiently. *But see King-Branch v. Cobb Cnty.*, No. 119CV01905JPBRDC, 2020 WL 11885532, at *5 (N.D. Ga. Dec. 18, 2020), *report and recommendation adopted*, No. 1:19-CV-01905-JPB, 2021 WL 806324 (N.D. Ga. Jan. 26, 2021), *aff'd*, No. 21-10653, 2022 WL 856078 (11th Cir. Mar. 23, 2022).

modified). "A Title VII complaint need not allege facts sufficient to make out a classic prima facie case, but must simply provide enough factual matter to plausibly suggest intentional discrimination." *Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1253 (11th Cir. 2017), *abrogated on other grounds by Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020). Indeed, a complaint need only "provide enough factual matter (taken as true) to suggest intentional [] discrimination." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).

"Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim" and "[r]acial discrimination against whites is just as repugnant to constitutionally protected values of equality as racial discrimination against blacks." *Bass*, 256 F.3d at 1103. A white male belongs to two protected classes under Title VII: one for his race, and one for his sex. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025) ("By establishing the same protections for every 'individual'—without regard to that individual's membership in a minority or majority group—Congress left no room for courts to impose special requirements on majority-group plaintiffs alone.").

**1. Messrs. Critelli, Theodore, Eggerichs, and Kumnick**

As to Messrs. Critelli, Theodore, Eggerichs, and Kumnick, there is no merit to the argument that the Amended Complaint fails to state a claim as to them. Each alleges that they are members of a protected class, they applied for or sought positions or promotions for which they were qualified, and they were rejected in favor of less-qualified "diverse" applicants because the DEI Policy created a preference for women and "people of color." These factual allegations of the Amended Complaint are sufficient to meet the standard articulated in *Iqbal* and *Twombly* and raise an inference of intentional discrimination against the Plaintiffs.

The Defendants further argue that the Plaintiffs fail to plead that the Defendants knew their race and that, without those allegations, the Plaintiffs could not plausibly state a claim for racial discrimination. But the Defendants' argument misses the forest for the trees. The essence of the Plaintiffs' claims is that the Defendants are so race- and sex-fixated that they adopted a DEI Policy that requires consideration of race and sex at every part of the hiring process. The Plaintiffs allege that the Defendants require "diverse slates" of interviewees for a position, and as the Plaintiffs argue, "[i]t is illogical that Defendants could engineer diverse slates without knowing candidates' demographics." The Motion is denied as to Messrs. Critelli, Theodore, Eggerichs, and Kumnick.

**2. Mr. Cunningham**

Mr. Cunningham's allegations are sufficient to state a claim for sex discrimination, but not race discrimination. He alleges that (1) he is a member of a protected class; (2) he was qualified and applied for a position; (3) despite qualifications, he was rejected; and (4) a less-qualified, female candidate was given the job. While he did not meet the position's residency requirement, he alleges that the requirement was waived for a female candidate who was hired. He also alleges that after interviewing for the position a second time, he was once again rejected in favor of a less-qualified, female applicant. These allegations are sufficient to infer intentional sex discrimination against him. But his race discrimination claim is due to be dismissed without prejudice, because he does not allege that the position was filled by an applicant outside of his protected racial class. The Motion is granted in part as to him.

**3. Mr. Volek**

Mr. Volek fails to state a claim and his claims are due to be dismissed with leave to amend. Mr. Volek alleges that he applied and interviewed for two positions: Regional Sales Manager and Distribution Manager. Despite over twenty-four years of experience in the industry, he was rejected from the positions. Mr. Volek does not allege that (1) he was qualified for the positions in which he applied and (2) the position was filled by an applicant outside of his protected class. So Mr. Volek's claims must be dismissed as they fail to state a claim for discrimination. However, Mr. Volek is granted leave to amend.

**D. Failure to Sufficiently Plead Rule 23 Class Requirements**

Next, the Defendants argue that the Plaintiffs failed to sufficiently plead class requirements under Rule 23. A party seeking class certification must satisfy each of the prerequisites of Rule 23(a), and at least one alternative requirement of Rule 23(b). *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003). Rule 23(a) provides that a class representative may sue on behalf of its members only if four prerequisites of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1039 (11th Cir. 2019) (citing *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)).

Under Rule 23(b), the party seeking class certification must establish that: (1) prosecuting separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications or prejudice to those members of the class not parties to the subject litigation; (2) the party opposing the class has refused to act on grounds that apply generally to the class, necessitating final injunctive or declaratory relief; or (3) questions

of law or fact common to the members of the class "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for [fair and efficient adjudication of] the controversy." Fed. R. Civ. P. 23(b).

Here, the Defendants primarily challenge the commonality requirement, arguing that the hiring and promotional decisions were made by "numerous individual hiring managers" across the OpCos and the Plaintiffs' wide-ranging allegations implicate an "unknown number of employment decisions . . . made by potentially hundreds of decisionmakers over several years . . . ." (Doc. # 24 at 18.) The Plaintiffs respond that the Defendants' challenge to the class-action allegations is premature at this stage, arguing that the fact-dependent inquiry is unsuited for a review of the pleadings. (Doc. # 49 at 14.)

The Defendants' challenge at this stage is premature. Dismissing class allegations at the pleading stage, without the opportunity to conduct some limited discovery, is the functional equivalent of denying class certification. *See* Fed. R. Civ. P. 23; *see also Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 933 (11th Cir. 2016) (reversing district court's striking of class allegations without limited discovery). Denying certification at this early stage is generally inappropriate, as class determination "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotation marks omitted). Class certification is an evidentiary issue, *see Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013), and "pleadings alone are often not sufficient to establish whether class certification is proper" so "the district court will need to go beyond the pleadings and permit some discovery and/or an evidentiary hearing to determine whether a class may be certified." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309

(11th Cir. 2008) (citation omitted); *see also Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1366 (11th Cir. 2021) (collecting cases and finding that class certification before discovery taken was premature). In sum, "[t]he question of class certification is generally not addressed on a motion to dismiss." *Chaney v. Crystal Beach Cap., LLC*, No. 8:10-cv-1056-T-30TGW, 2011 WL 17639, at *2 (M.D. Fla. Jan. 4, 2011).

However, while six of the seven classes or subclasses survive dismissal, Mr. Volek's proposed subclass must fail, as his individual discrimination claims are due to be dismissed for failure to state claim. Because the "legitimacy of a private Title VII suit brought on behalf of a class depends upon . . . an individual plaintiff with a cognizable claim," *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987), Mr. Volek's class allegations must be dismissed, as Mr. Volek failed to plead a cognizable claim of discrimination. The remaining classes and subclasses are not dismissed, however, because Plaintiffs were able to "identify a single potential class member." (*Cf.* Doc. # 24 at 22.)

The remaining Plaintiffs allege a nationwide, discriminatory policy affecting the promotional and hiring opportunities of a potentially large class of current and former employees. The allegations regarding Danaher's DEI Policy, and its effects on the purported class, will no doubt require some amount of limited discovery. Without the opportunity to conduct some discovery regarding class certification, dismissal at this stage would be premature. Accordingly, the Motion is denied to the extent that it seeks dismissal of the class allegations.

### E. Failure to State a Claim as to Defendant Danaher

Finally, Danaher asserts that, as an individual corporation and distinct entity from its subsidiaries, it is not a proper defendant here because there are no specific allegations against it. (Doc. # 24 at 23.) Danaher argues that it is not an "integrated enterprise" or "joint-employer" over the employees of Danaher's OpCos. Danaher asserts that the Amended Complaint contains no allegations that Danaher "actually had the power to hire, fire, supervise, or discipline [OpCos employees] . . . as the respective and distinct operating companies that employed them are the final decision makers . . . ." (*Id.* at 25.) In short, Danaher argues that the Plaintiffs failed to allege any control over hiring/promotional decisions of the OpCos, and should thus be dismissed as a defendant.

The Plaintiffs assert that whether Danaher is an "integrated enterprise" or "joint-employer" is a fact-intensive analysis and inappropriate at the motion-to-dismiss stage. (Doc. # 49 at 18.) Nevertheless, the Plaintiffs assert that their allegations of "centralized policy control and implementation" by Danaher regarding its DEI Policy go beyond mere corporate affiliation. (*Id.* at 19.)

Title VII provides that an employee may recover for any act of employment discrimination by their employer because of race, color, religion, sex, or national origin which affects the terms or conditions of their employment. 42 U.S.C. § 2000e–2(a)(1). An "employer" is defined as "one or more individuals, . . . partnerships, . . . corporations, [or] legal representatives . . . ." *Id.* § 2000e(a), (b). Before a parent corporation and its subsidiary will be treated as a single employer under Title VII, the plaintiff must show the existence of an inter-relationship between the entities sufficient to justify a belief by the discriminated-

against employee that the entities are jointly responsible for the acts. *See McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). To establish an integrated relationship, the Court must evaluate four factors: (1) the extent to which operations are interrelated; (2) whether there is common management; (3) whether there is centralized control of labor relations; and (4) whether there is common ownership or financial control. *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999).

Here, the Plaintiffs have sufficiently alleged an integrated enterprise between Danaher and its OpCos. The last element of common ownership is easily satisfied by the allegations that Danaher is the parent company comprised of its subsidiaries, among which are the OpCos. As to the remaining three elements, the Plaintiffs allege that Danaher asserts centralized control over the OpCos, including its recruiting and hiring practices. (Doc. # 20 ¶ 34.) The Plaintiffs further allege that Danaher "dictates" the compensation and performance metrics of employees within the OpCos, exerting its control over management and ensuring compliance with its policies, including the DEI Policy. (*Id.* ¶¶ 35, 36.) Indeed, the DEI Policy itself states that it applies to Danaher, along with its "directly and indirectly controlled subsidiaries worldwide." (*Id.* ¶ 52; *see also id.* ¶ 54) ("This Policy applies to Danaher Corporation and all of its directly and indirectly controlled subsidiaries worldwide, and each of their respective associates.").

In one example, the Amended Complaint alleges in detail how open positions and promotional opportunities for any Danaher subsidiary are posted on a "centralized Danaher website" in which *any* employee can apply for *any* position across all the companies. (*Id.* ¶ 55.) The centralization of hiring, firing, compensation, metrics, management, and applications all

weigh in favor of finding an integrated enterprise. But most importantly, the DEI Policy's application to Danaher and its OpCos—the very policy giving rise to the discrimination claims present here—weighs strongly toward a finding of integration.

Ultimately, "[t]o decide whether an entity is a qualified employer [under Title VII]," the "basic question" is '"who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim."' *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1297 (11th Cir. 2016) (quoting *Riviera Beach*, 166 F.3d at 1345 (en banc)). Based on the allegations here, Danaher's DEI Policy controlled one of the most fundamental aspects of the employment relationship: promotional opportunities—and the DEI Policy forms the basis of the Plaintiffs' discrimination claims. So the Amended Complaint sufficiently alleges the existence of an integrated enterprise, and at this stage, the claims against Danaher will remain.[9]

Accordingly, it is now

**ORDERED** and **ADJUDGED** that:

1. The Defendants' Motion to Dismiss (Doc. # 24) is **DENIED**, except to the extent that it sought dismissal of Mr. Cunningham's race discrimination claims and Mr. Volek's claims;

2. As to Mr. Cunningham and Mr. Volek, their claims are dismissed without prejudice and with leave to amend. If it can be done consistent with Rule 11, an amended complaint may be filed on or before November 2, 2026; and

[9] Because the allegations establish an "integrated enterprise," the Court need not discuss whether the allegations support the finding of a "joint employer."

3. In all other respects, the Motion is **DENIED**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this October 23, 2026.

**ANNE-LEIGH GAYLORD MOE**
UNITED STATES DISTRICT JUDGE

**Copies to:**
Counsel of Record